UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

UNITED STATES OF AMERICA,

v.                                                    Case No. 3:23cr9-TKW-HTC

SHANNON L. WILKERSON,

     Defendant.

_____/

<u>ORDER OF RELEASE</u>

On March 3, 2023, the Court held a 4-hour hearing on the Government's oral motion for detention, pursuant to the Bail Reform Act of 1984, as amended, 18 U.S.C. § 3141, *et seq* (the "Act"). Based upon the information contained in the pretrial services report, the evidence and testimony presented at the hearing, and the arguments of counsel, the Court finds Defendant Shannon L. Wilkerson shall be released pending trial subject to the conditions set forth in the attached Conditions of Release. This is not a rebuttable presumption case,[1] and the Government has not

_____

[1] Under § 3142(e)(3), for certain offenses there is a rebuttable presumption in favor of detention. 18 U.S.C. § 3142(e)(3). If the rebuttable presumption applies, the burden of production is on the defendant, while the burden of persuasion remains on the Government. *See e.g., United States v. Abad*, 350 F.3d 793, 797 (8th Cir. 2003) (quoting *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001)). Despite the penalty associated with this charge, there is no dispute a rebuttable presumption does not apply to this charge of murder under 18 U.S.C. § 1111. *See United States v. Rudolph*, 582 F. Supp. 3d 804 (D. Colo. 2022) (affirming magistrate's determination that charge under 18 USC § 1111 *was* a rebuttable presumption case under 924(c) *only* because a firearm was used in the commission of the murder).

shown by a preponderance of the evidence Wilkerson poses a risk of nonappearance or by clear and convincing evidence Wilkerson poses a danger to the community.

## I.     The Bail Reform Act

The Act provides a framework for determining whether pretrial detention is appropriate. *See* 18 U.S.C. § 3142. Under the Act, a court has the choice to either release or detain a defendant. *See Reno v. Koray*, 515 U.S. 50, 57 (1995) (citing 18 U.S.C. § 3142(a)(2), (a)(3)). In making that choice, courts must keep in mind that "liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987).

A court shall detain a defendant if it determines that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1); *see United States v. Price*, 773 F.2d 1526, 1528 (11th Cir. 1985) (the policy of the Act "is to permit release under the least restrictive condition compatible with assuring the future appearance of the defendant"). The Government has the burden of establishing a defendant is a risk of flight by a preponderance of the evidence or is a risk of danger by clear and convincing evidence. *See United States v. King*, 849 F.2d 485, 489 (11th Cir. 1988). "Clear and convincing evidence" entails more than a preponderance of the evidence, but less than evidence establishing a fact beyond a reasonable doubt. *Addington v. Texas*, 441 U.S. 418, 423-25 (1979). "To

find danger to the community under this standard of proof requires that the evidence support such a conclusion with a high degree of certainty." *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985).

In determining whether there are conditions of release that will reasonably assure both the defendant's appearance at trial and the safety of any other person and the community, a court considers the following factors: (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.  18 U.S.C. § 3142(g).  The Act, however, says nothing about the relative weight a court should give each factor when deciding whether to release or detain a defendant.  *See generally* 18 U.S.C. § 3142(g).  Instead, the weight given to each factor will inevitably vary from case to case and might even vary depending on whether the inquiry relates to a defendant's danger or to his risk of flight.  *United States v. Zhang*, 55 F.4th 141, 149-50 (2d Cir. 2022).

## II.    ANALYSIS

Conducting detention hearings is a duty Congress specifically assigned to United States Magistrate Judges, 28 U.S.C. § 636(a)(2), and detention decisions are by far the hardest decisions a Magistrate Judge makes.  If the decision is to detain,

the court is detaining a person who has not yet been found guilty and who may later be found not guilty.  Whether that person serves 3 months or 1 year in pretrial detention, those are days and time he or she will never get back.  They are forever lost.  And if the decision is to release, and the defendant violates the conditions of release, that violation could result in more crimes upon more victims.  The Court does not have a crystal ball and can never be certain a defendant will not violate their conditions of release.  The Court, however, also cannot be handcuffed by the fear of a possible violation.  The question is whether the Court can be "reasonably assured" a defendant will not flee or commit another crime if released.  *See generally,* 28 U.S.C. § 3142.

Having carefully considered the evidence presented, weighed the credibility of the witnesses, and applied the factors below to the evidence, the Court finds Wilkerson should be placed on pretrial release.  It is undisputed the crime Wilkerson is alleged to have committed is serious and heinous.  It is also undisputed the crime occurred 20 years ago, the evidence relied upon by the Government is circumstantial, and with the exception of recent DNA evidence, none of the other evidence the Government has had over the last 20 years prompted the Government to charge Wilkerson with a crime.  It is also undisputed Wilkerson has minimal criminal history, has spent no time in custody, and has the support of his family and two communities.

Thus, in this case, for the Court to find Wilkerson is a flight risk or danger to the community, the Court must also find that the weight of the evidence is strong enough to make the imposition of a life sentence a real motivation for Wilkerson to flee prosecution and leave his family.  As discussed below, while the Government's case is not insignificant, the Court simply cannot reach that conclusion, particularly when considering the letter and intent of the Act, the Government's burden, Wilkerson's history and characteristics, and the conditions the Court may impose.

A. <u>Nature and Circumstances of the Offense Charged.</u>

Under § 3142(g)(1), certain offenses, such as crimes of violence, certain drug offenses, and offenses involving minors, by their nature weigh in favor of detention. Here, the Government accuses Wilkerson of killing 19-year-old Amanda Gonzalez through suffocation, strangulation, and blunt force trauma on November 3, 2001. Ms. Gonzalez was pregnant when she was murdered.

The seriousness of the charged offense cannot be overstated.  The crime is clearly one of violence.  *United States v, Coleman*, 2001 WL 1249682, at *4 n.2 (N.D.N.Y. July 24, 2001) ("Congress has made it clear that the nature of the crime as one of violence is an important consideration, particularly on the issue of dangerousness."); 18 U.S.C. § 3142(g)(1).  And "in terms of violence, it does not get more serious than murder." *United States v. Massey*, 2014 WL 3671885, at *2 (M.D. Tenn. July 23, 2014).

Moreover, several jurisdictions have recognized that a defendant facing life in prison, if convicted, has every incentive to flee. *United States v. Nichols,* 897 F. Supp. 542, 547 (W.D. Okla. 1995), *aff'd* 1995 WL 430191 (10th Cir. July 21, 1995) ("The prospect of a lengthy prison term, life imprisonment or the death penalty provides Defendant with a great incentive to flee."); *United States v. Fama*, 2013 WL 2467985, at *4 (S.D.N.Y. June 7, 2013) (discussing defendant's possible life sentence as a factor to consider in assessing risk of flight); *United States v. Ouedraogo*, 2009 WL 3270076, at *3 (W.D. Mich. Oct. 8, 2009) (noting "Defendant has a much greater incentive to flee" now that he is facing a murder charge and not just financial crimes). Also, while not a death penalty or life imprisonment case, in *United States v. Quartermaine*, 913 F.2d 910 (11th Cir. 1990), the Eleventh Circuit found the Government had met its burden of showing the defendant was a flight risk, given his ties to a foreign country, significant resources, statements made to officers about fleeing, and possibility of an over 60-year sentence.[2]  *Id.* at 917; *see also*

---

[2] The Government also referenced Judge Rodgers' decision in *United States v. Depine*, Case No. 3:19cr2-MCR, granting the Government's motion to revoke Judge Kahn's release order in a rebuttable presumption, hands-on child enticement, pornography, and production case.  As discussed in open court, the potential for a lengthy sentence was just one factor Judge Rodgers considered.  As Judge Rodgers stated in her order, "This would perhaps be a different case if the penalties were not so severe, if the circumstances of the offenses were not so permeated with deceit and lacking in self-restraint, if there was no evidence that Depine had ever engaged in hands-on sexual behavior with an impressionable young girl, and if he did not also possess child pornography depicting the sexual exploitation of two different prepubescent minor children.  If these factors had not been present, the Magistrate Judge's release order might be appropriate." N.D. Fla. Case No. 3:19cr2-MCR, ECF Doc. 42 at 6.

*United States v. English*, 629 F.3d 311, 321-22 (2d Cir. 2011) (affirming detention in part because the defendant faced a presumption against release and a mandatory sentence that incentivized fleeing).  Thus, as the defense concedes, the nature and circumstances of the offense weigh in favor of detention.

      B.  <u>Weight of the Evidence</u>.

      The second § 3142(g) factor requires the district court to consider evidence proffered by the Government which it intends to use at defendant's trial.  "While it is true that the Court's determination of this factor 'neither requires nor permits a pretrial determination of guilt,' the Court can still weigh the evidence and determine whether it proves that the defendant poses a risk to others and/or is at risk of flight." *United States v. Slatten*, 286 F. Supp. 3d 61, 67–68 (D.D.C. 2017) (internal citations omitted), *aff'd*, 712 F. App'x 15 (D.C. Cir. 2018).

      The weight of the evidence is a common-sense consideration.  If the evidence against a defendant is overwhelming, credible, helpful, and important to the Government's case in chief, and the sentence upon conviction is lengthy, a defendant has stronger motives to flee to avoid future court proceedings and may indicate the defendant is a present danger to himself or the community if the Government's allegations later prove to be true.  *United States v. Blackson*, 2023 WL 1778194, at *10 (D.D.C. Feb. 6, 2023); *United States v. Iverson,* 2014 WL 5819815, at *4 (W.D.N.Y. Nov. 10, 2014) ("When evidence of a defendant's guilt is strong, and

when the sentence of imprisonment upon conviction is likely to be long ... a defendant has stronger motives to flee.") (internal citation omitted).  Conversely, if the only evidence against a defendant is circumstantial, contradicted, or unreliable, the defendant has less reason to avoid court proceedings in the interest of proving his innocence and that evidence does not support viewing the defendant as a risk to the safety of the community.  *Blackson*, 2023 WL 1778194, at *10.

The following is a summary of the evidence presented by the Government at the hearing, through the testimony of FBI Agent F. Donato[3] and Exhibits A-H.

In 2001, Wilkerson, his wife, A. Martinez, and the victim, Ms. Gonzalez, were soldiers in the Army, stationed in Hanau, Germany.  Although Martinez and Wilkerson were married, they did not live in the married dorms.  Instead, Martinez and Ms. Gonzalez lived next door to each other in Barracks Building 1326, while Wilkerson lived in Building 1323.  At the time of Ms. Gonzalez's murder, she was 4 ½ months pregnant, but did not know who the father of the child was – believing it was either Wilkerson or another Army soldier, M. Johnson.[4]   According to

---

[3] When the murder occurred, it was initially investigated by the Department of the Army Criminal Investigation Division ("CID").  In 2014, the Army asked the FBI to get involved.  According to Agent Donato, nothing precipitated the Army to make that request, other than it was a cold case. Agent Donato's testimony was primarily based on his review of the CID investigation file, including statements and contemporaneous interviews of witnesses taken by the Army, as well as interviews the FBI did once it took over the investigation in 2014.

[4] Agent Donato testified that CID located a notebook belonging to Ms. Gonzalez in which she wrote various baby names, some with the last name of Wilkerson and others with the last name of Johnson.  Also, Johnson was excluded as a suspect because he was on field training at the time of the murder.

interviews with witnesses, Wilkerson admitted to the relationship with Ms. Gonzalez, told various people that he was afraid he was the father of her child, and witnesses indicated Ms. Gonzalez wanted to end the relationship. Martinez was also pregnant with Wilkerson's child at the same time.

On Friday, November 2, 2001, a mutual friend of Ms. Gonzalez and Wilkerson, S.H.,[5] was having a party in his room. S.H. lived in the same Barracks building and on the same floor, the third floor, as Ms. Gonzalez and Martinez. Because of the party, S.H. left his door open for people to come in and out. Wilkerson came and went from the party, re-entering the room around 11:00 PM – 12:00 PM. At that time, according to S.H., Wilkerson was very excited and wanted people at the party to do shots with him, but left after not being able to get any takers.

Wilkerson then went to the room of another friend, C.C., who lived in the same Barracks as Wilkerson, Building 1323. According to C.C., Wilkerson told C.C. he had something to tell him, but never finished that thought. Wilkerson stayed in C.C.'s room until 1:00 AM, when the two men went to the International Club, a bar on base. Wilkerson and C.C. were at the International Club until it closed at 2:00 AM. Wilkerson then wanted to go to a bar off base, the Millennium Club. C.C., however, did not want to join Wilkerson because he was scheduled to work in the

---

[5] Because the Court does not have the exact spelling for the names of the witnesses referenced by Agent Donato, the Court will use their initials.

morning.  The two then went to an ATM machine on base and Wilkerson withdrew $20, which C.C. took from him, believing that Wilkerson was too drunk to leave the base.  Wilkerson then pulled out another $20, and at that point, C.C. caved and gave Wilkerson back the original $20.  C.C. also loaned Wilkerson a grey sweatshirt because it was cold that evening and Wilkerson was in shorts and a t-shirt, before the two parted ways, with Wilkerson walking toward the front gate.

At the gate, however, Wilkerson was turned away and not allowed to leave the base.  Wilkerson left the gate area around 2:15-2:20 AM, and at 3:15 AM was seen in the room of another soldier, R.S.  There were other people in R.S.'s room at the time who were drinking, including E.V.  According to E.V., Wilkerson told E.V. to tell Martinez that if anyone asked, she and Wilkerson were drinking all night. E.V. thought this request was odd as he and Wilkerson were not particularly close. Wilkerson was seen wearing the grey sweatshirt when he entered R.S.'s room, but took it off at some point, and left it in R.S.'s room when he left.  Wilkerson stayed in R.S.'s room for about 15-20 minutes, long enough to have one beer.

Sometime after 4:00 AM, Wilkerson went into the room of T.L., in Building 1326.  T.L. was in a relationship with A.J., who was also in the room.  Wilkerson asked if he could come in and watch TV and put his hands on his head, saying, "I f—up, I f—up."

On Monday, November 5, 2001, after Ms. Gonzalez failed to report to work, a Sergeant and Captain went to her room to check on her.  When they entered the room, they found Ms. Gonzalez, unresponsive, naked from the neck down,[6] and lying on her back on the floor, with a pair of BDU pants covering her face.  Agent Donato is not aware of any witness statements or evidence indicating anyone moved Ms. Gonzalez's body before crime scene photos were taken but is aware some clothing may have been removed.  For example, first responders removed the BDU pants.[7]

Although Agent Donato was also not aware if anyone tried to revive Ms. Gonzalez, crime scene photos introduced into evidence by the Government, Exhibits C-E (under seal), show Ms. Gonzalez was naked from the waist down but wearing a white t-shirt that was pulled up so first responders could apply electrodes to her chest.  Ms. Gonzalez also had contusions and bruises on her face and body.  The BDU pants are shown lying next to Ms. Gonzalez in the photo.

The autopsy report, Gov't Ex. F (under seal), identifies the cause of death as asphyxiation, with strangulation being a major component, but not being able to rule out the concurrent smothering.  Additionally, the blunt force trauma to the head may

---

[6] This is incorrect.  Crime scene photos and the autopsy report show Ms. Gonzalez was wearing a shirt and bra.
[7] Although Agent Donato testified the BDU pants were covering Ms. Gonzalez's face, the autopsy report indicates the pants were found encircling her neck.

have been a contributing factor.  The report also noted injuries suggesting "recent forceful intercourse."  According to the report, Ms. Gonzalez was found wearing the white t-shirt discussed above, as well as a white cotton bra lying above her breasts. The report also identifies the date of death as November 5, 2001, the day she was found.

As part of its investigation, CID interviewed S.H.  As stated above, S.H. lived in Building 1326.  He had a popcorn machine in his room that other soldiers often used.  About one to two weeks before the murder, while Wilkerson was visiting with S.H., Ms. Gonzalez entered the room to use the popcorn machine.  Ms. Gonzalez ignored Wilkerson.  After Ms. Gonzalez left the room, Wilkerson shared with S.H. that Ms. Gonzalez was pregnant with his child and that was causing problems between Wilkerson and Martinez.  Wilkerson also stated he hated Ms. Gonzalez and could not stand the sight of her.  Wilkerson asked S.H. to help mediate the problems between him and his wife, Martinez.

Another witness, A.J., who was also friends with Wilkerson, told investigators that around the same time, two weeks before the murder, Wilkerson told him if Ms. Gonzalez told anyone the baby was his, he would kill her.  Wilkerson emphasized that statement by saying, "I promise, I promise."  Wilkerson also told A.J. Ms. Gonzalez had threatened to tell the command staff about their relationship, which could hurt his chance at a promotion.

As part of the CID's investigation, CID obtained C.C.'s grey sweatshirt from him, which he retrieved from R.S.'s room, possibly a couple of days after the murder. CID conducted DNA testing on the sweatshirt and "other items," which were all inconclusive, even when compared with Wilkerson's DNA and Ms. Gonzalez's DNA, because the samples were too small given the technology that was then available.  In 2021, seven (7) years after the FBI took over the investigation, the same DNA analyst tested the sweatshirt again, and found DNA on the right sleeve of the sweatshirt which showed a mixture of DNA belonging to C.C., Ms. Gonzalez, and Wilkerson.

Agent Donato did not conduct the DNA testing, is not a DNA expert, and could only testify as to what the results of the 2021 testing showed, which was the DNA was 350 billion times more likely to belong to C.C., Wilkerson, and Ms. Gonzalez, than C.C. and two unknown contributors.  It was also 2.7 billion times more likely the DNA on the right sleeve came from those three than from C.C., Ms. Gonzalez, and an unknown person other than Wilkerson.  It was four thousand times more likely that it originated from those three, rather than some unknown person other than Ms. Gonzalez, when compared with C.C. and Wilkerson.  Although not known by Agent Donato, the Government proffered through counsel that the technology used in 2021 was not available in 2014 or prior years.  Agent Donato

testified the DNA testing was prompted when the FBI realized the CID had not collected any DNA from C.C., who owned the sweatshirt.

Finally, according to Agent Donato, the last time anyone saw Ms. Gonzalez alive was around 10:00 P.M. on November 2, 2001.  She was seen in her building walking to the bathroom.  Also, friends tried to call her and knocked on her door over the weekend, but she never responded.

On cross-examination, Agent Donato could not recall the ages of the witnesses who were interviewed, when or how many times they were interviewed, if there were any inconsistences in their statements over the years, or the identity of all witnesses who were interviewed.  Agent Donato did not know if Wilkerson had offered to take a polygraph or if one was provided.  Agent Donato testified on cross that Ms. Gonzalez's keys were missing and never found and the wall locker in her room was found in disarray.  He also testified that around the same time as Ms. Gonzalez's murder, there had been three other assaults on females at the base. Additionally, other than the statements witnesses attributed to Wilkerson, witnesses did not identify anything else noteworthy about Wilkerson's conduct or appearance that evening.

According to the Government, the strength of its evidence weighs in favor of detention.  The Court cannot agree.  For the past 20 years, the Government has had all of the interviews testified about by Agent Donato.  It has known about the

statements allegedly made by Wilkerson to his friends in the weeks before and on the day of the murder.  It has had the timeline of Wilkerson's whereabouts from approximately 11:30 PM that night until 4:00 AM, and has known he was unaccounted for by witnesses for a 1-hour period.  It has known about Wilkerson's infidelity and his purported animus toward Ms. Gonzalez.  The CID interviewed Wilkerson on multiple occasions, including at the time of the murder and in 2012. The only difference between the Government's case now and what it had in 2001 is the DNA found on the sleeve of the grey sweatshirt.  The problem is, other than being able to testify about the results of the DNA testing, Agent Donato did not provide any additional information about the DNA found.

He did not identify the type of DNA found – whether it was blood, skin, hair, etc.  He did not know the sample size.  He did not know whether the 2021 testing was based on a preserved sample or on a new swab of the sweatshirt.  He did not know why DNA was not obtained from C.C. by CID.  He could not explain how the DNA testing had changed such that new DNA testing could be performed on the sweatshirt, and simply testified it "somehow" made a difference.  He could not explain how having C.C.'s DNA made a difference to the test results.  He did not provide any testimony regarding whether other inclusion or exclusion samples (other than the ones collected of the two first responders and of one dorm resident by the FBI) were collected for comparison.

Such information could have gone a long way in bolstering the strength of the DNA evidence and excluding other possibilities for how Ms. Gonzalez's DNA was found on the sweatshirt.  For example, C.C. wore the sweatshirt to the International Club, where he was for an hour.  Presumably, there were others who were at the Club that night, yet, there was no testimony about how the Government excluded the possibility that Ms. Gonzalez's DNA was on the sweatshirt based on her presence at some point at this location.[8]  Moreover, Wilkerson wore the sweatshirt to R.S.'s room, where other people were drinking, and the shirt stayed there over the weekend and for at least two more days after the murder before C.C. gave it to CID.  In other words, while the Government is relying on the DNA found on the right sleeve of the sweatshirt as evidence Wilkerson was with Ms. Gonzalez between 2:15 AM to 3:15 AM on November 3, the evidence presented failed to exclude other potential explanations for how Ms. Gonzales's DNA may have gotten there.

Also, Agent Donato admitted there were other people's DNA found in Ms. Gonzalez's room but did not provide any testimony about whether those were tested or who they belonged to.  Additionally, Agent Donato testified there was evidence Ms. Gonzalez was having sex with multiple persons other than Wilkerson and Johnson, and despite the reference in the autopsy to "recent forceful intercourse," provided no testimony about whether those people have been excluded and if so,

---

[8] Agent Donato also did not know whether C.C. may have worn the sweatshirt earlier that day.

how.  When asked if the FBI tested the DNA of any other items or from any other people, Agent Donato responded that the FBI "resubmitted items found to be significant," but did not provide any further information.  Moreover, if Ms. Gonzalez was last seen by witnesses interviewed by the CID at 10:00 PM on November 2, and not allegedly murdered by Wilkerson until sometime between 2:15 AM to 3:15 AM (the only time Wilkerson had the sweatshirt), then her activities, including whether she may have been with someone else or was even in her room the whole time are unknown.

A detention hearing is not a trial, and the Government is certainly not expected to present all its evidence or prove its case against Wilkerson beyond a reasonable doubt at this stage.  The Government, therefore, had no obligation to present a witness with more knowledge about the DNA testing or to provide any more evidence than it did.  "The Government is entirely within its rights to withhold the evidence from public view at this stage of the proceeding, but the Court must then make the detention decision solely on the basis of the charge and [the evidence presented]." *United States v. Eischeid,* 315 F. Supp. 2d 1033, 1036 (D. Ariz. 2003) (releasing a defendant charged with murder as a violent crime in aid of racketeering because the Government's limited proffer was not sufficient to meet its burden, despite the gravity of the charge and potential death penalty, particularly when the other factors weighed in favor of release).

As the defense points out, what the Government showed at the detention hearing is that its case against Wilkerson is based on (1) interviews taken 20 years ago of soldiers in their 20s who may have had their own motivations and biases, and whose memories are likely to have now faded, and (2) DNA found on the sleeve of a grey sweatshirt. Indeed, other than finding Wilkerson's DNA on Ms. Gonzalez's sheets, which is consistent with his prior sexual relationship with her, no evidence was presented showing Wilkerson's DNA was found on Ms. Gonzalez's t-shirt, her bra, her body, or the BDU pants which were encircling her neck. As the Government points out, circumstantial evidence can be just as persuasive as direct evidence. However, "[w]hether presented by proffer or direct evidence, courts retain the responsibility for assessing the accuracy of the Government's proof." *United States v. Enix*, 209 F. Supp. 3d 557, 573 (W.D.N.Y. 2016) (reversing magistrate judge's detention order in a rebuttable presumption RICO case despite a 50-year potential sentence based on lack of strength of the evidence, and history and characteristics of the defendant).

"While it remains to be seen whether [Wilkerson] will ultimately be convicted at trial of the charges in the [] Indictment, it is not the Court's role at this stage of the proceedings to assess [Wilkerson]'s guilt or innocence." *Id.* at 573. Here, common sense says the strength of the evidence is not such that the potential of a life sentence, alone, is reasonably likely to cause Wilkerson to flee or pose a danger

to the community. *United States v. Megahed*, 519 F. Supp. 2d 1236, 1242 (M.D. Fla. 2007) ("Assessment of the flight risk posed by a defendant often implies a calculation of the relative cost of remaining and submitting to trial or, in the alternative, fleeing the jurisdiction.").

  C. <u>The History and Characteristics of the Defendant</u>.

  In considering the history and characteristics of a defendant, a court considers such matters as the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings. 18 U.S.C. § 3142(g). Ties to the community are a factor in determining whether a defendant poses a flight risk, but the ties must be the "sort of family ties from which [the court] can infer that a defendant is so deeply committed and personally attached that he cannot be driven from it by the threat of a long prison sentence." *United States v. Rueben*, 974 F.2d 580, 586 (5th Cir. 1992).

  Wilkerson is 42 years old. He was born in Andalusia and has a residence there, which he co-owns with his two brothers. Wilkerson's mom lives in Brewton. Wilkerson has lived in Brewton, Andalusia, or in Crestview the majority of his life. Wilkerson's family members, including his aunt, Cynthia Nelson, who testified on his behalf, and his cousins live in Andalusia. According to Ms. Nelson, their family

grew up in Andalusia, on the "hill," and live near one another on family property. Wilkerson was in the Army from 1999 to 2004, when he was honorably discharged.

Wilkerson was married to Martinez for 9 years, until they divorced around 2011. He has two children with Martinez, a 21-year-old daughter and a 14-year-old son.[9] Although both children live in North Carolina with their mother, according to Ms. Nelson, Wilkerson is close to the children and is a source of financial and emotional support for them. He speaks to them regularly and sees his son on holidays. His son was also supposed to live with him this summer. His daughter is expecting a child as well, so he will be a grandfather.

In 2018, Wilkerson got a job as an equipment operator on Eglin Air Force Base. He was arrested at the Base and has been placed on suspension as a result of the indictment. Thus, upon release, he cannot return to that job. However, the defense provided a Declaration from Investigator Isaac R. Lau, indicating he has confirmed with Kristi and James O'Brien, the owners of Big Iron Environmental Inc., that Wilkerson can work for their company if released. *See* Defense Ex. B (the O'Briens were scheduled to be out of the country for vacation on the date of the hearing).

---

[9] According to the pretrial report, Wilkerson also has a 3-year-old child, but he does not have a relationship with that child.

Because Wilkerson worked at Eglin, he would often stay in Crestview during the week with his cousin, Kevin Williams, who also testified on his behalf. Mr. Williams owns a 4-bedroom home in Crestview, where he lives with his wife and two daughters, none of whom have any felony record. Mr. Williams is a software developer at Eglin. To allow for Wilkerson to be supervised by the U.S. Probation Office here in the Northern District, the defense's release plan is for Wilkerson to live with Mr. Williams and his family.

According to the testimony of Ms. Nelson and Mr. Williams, before his arrest, Wilkerson spent his time working and traveling back and forth between Andalusia or Brewton and Crestview to coach youth baseball and basketball. When he was not coaching youth sports, Wilkerson was involved with church or other community groups. Both Ms. Nelson and Mr. Williams committed to the Court they would ensure Wilkerson abides by his obligations to the Court and answers the charge.

The defense also presented the Court with letters of support from 45 individuals in the Brewton, Andalusia, and Crestview areas who met Wilkerson through youth athletics or community events, at church, or worked with him at Eglin. *See* Defendant's Exs. A1-45. The letters were written by various individuals, some of whom have known Wilkerson for a couple of years to some who have known him for five or more years to a few who have known him his entire life. The individuals

run the gamut from co-workers,[10] to the parents of kids he's coached, to the kids themselves, to people he has met and developed relationships with in the community. In addition to these letters, many other friends and family (over 40) came to the hearing to support Wilkerson, including his brothers, cousins, friends, co-workers, and supervisors.

A consistent refrain in the letters is that Wilkerson is involved in several organizations in the community where he serves as a mentor to the young and the old and is an asset to the community.  For example, Wilkerson is involved in the racing community, where he organizes events, including those for kids.  He is also involved with the Baker Youth Sports Association, where he coaches youth baseball, is on the board, and is a commissioner.  He started a recreational league for middle schoolers that was not previously available.  Based on letters from parents and kids, Wilkerson has had a positive impact on the lives of those he has coached.  There are also letters from men who have gotten to know Wilkerson from his involvement in the ministry NW Florida Men's Encounter.   These men spoke of Wilkerson's commitment to his faith, to his community, and to his family.

The Court also considered the pretrial services report.  Based on the report, Wilkerson has had a couple of incidents with law enforcement, none of which

---

[10] One of the letters is from James Pennington, a former co-worker and then supervisor to Wilkerson.  Mr. Pennington also testified for Wilkerson and said if it was up to him, he would hire Wilkerson back in a heartbeat and also let him live with him.

resulted in any period of incarceration, and the most significant of which occurred more than 18 years ago.  First, in 2004, Wilkerson was charged with third degree domestic violence, in an incident involving Martinez, but that charge was dismissed in 2005.  That charge, however, included an allegation that Wilkerson tried to choke his wife.  *See* Gov't. Ex. G.  Wilkerson was also found guilty in 2004 of public intoxication and resisting arrest, relating to an altercation between him and one of his brothers.  During that incident officers had to use chemical agents to control Wilkerson and his brother.  Wilkerson had a BAC of .23.  *See* Gov't Ex. H.

Additionally, the pretrial report indicates Wilkerson was found guilty in 2005 of public intoxication and received a traffic citation in 2016 for having an open container.

While acknowledging this factor weighs "slightly" in favor of release, the Government argues the two incidents from 2004 and 2005 show Wilkerson is violent when he is intoxicated.

The Court finds this § 3142(g) factor weighs heavily in favor of release.  As shown by the witnesses who testified for Wilkerson, the 45 letters of support, and the significant number of people of all races and ages who took time out of their day to come to the hearing, Wilkerson has significant community and familial ties to the Crestview area and nearby areas of Andalusia and Brewton.  Nothing in his history or characteristics show that he will flee to avoid prosecution.  The Government

pointed to a few failures to appear for traffic violations, but the defense proffered that some, if not all those instances, were due to Wilkerson's deployment overseas.

As for the 2004 and 2005 incidents, the Court does not find they show Wilkerson is violent or a danger to the community, given the age of those charges. Moreover, any risk of danger those incidents suggest can be managed with a no alcohol condition.  Indeed, it appears from the pretrial services report that Wilkerson recognized he had an alcohol problem in 2016, and took measures to deal with it, including spending 3-days in an inpatient treatment program at the VA.[11]

D. <u>The Nature and Seriousness of the Danger Posed by Release</u>.

The fourth § 3142(g) factor requires the Court to consider, given the discussions above, whether there are any conditions that would reasonably assure the Court Wilkerson will not flee or pose a danger to the community, if released. And the Court finds there are.

This case is a unique one.  It is not typical for a defendant to have 20 years to show the Court he is neither a flight risk nor a danger to the community.

Certainly, the gravity of the offense gives the Court significant pause.  As stated above, several courts have given considerable weight to the prospect of a death penalty or life imprisonment.  But generally, like in *Depine* and *Quartermaine,* the

---

[11] Per the pretrial services report, in 2015, Wilkerson was diagnosed by providers at the VA with PTSD and alcoholism.

prospect of a significant penalty is combined with other factors which indicate the court cannot be reasonably assured the defendant will not flee or pose a danger. Those other factors simply do not exist here.  In addition to the lack of strength of the evidence, Wilkerson has strong ties to the community, a supportive family, and not the type of monetary resources that would make fleeing an easy choice. Moreover, as the defense points out, Wilkerson was interviewed by CID multiple times, including in 2012, and even though the FBI did not interview him recently, he has clearly known he was a suspect.  Yet, at no time did he try to hide his whereabouts or run from the charge.  Instead, he returned to his hometown and took a job as a civilian at a military base.

Thus, the Court is reluctant to find that Wilkerson poses a serious flight risk or danger amidst what is "otherwise [a] stable life solely because the charge asserted by the Government carries [a life penalty]."  *Eischeid*, 315 F. Supp. 2d at 1037.  The nature of the offense is simply one factor for the Court to consider.  *See Enix*, 209 F. Supp. 3d at 565 ("[T]he first of the § 3142(g) factors … is one factor in the analysis. [The] consideration of the remaining factors weighs in favor of releasing Defendant with reasonable bail conditions.").  As the court in *Eischeid* noted, "If Congress has not created even a rebuttable presumption of detention in death penalty cases, this Court should not effectively create an irrebuttable presumption of detention by

holding that the prospect of the death penalty alone is sufficient to create a serious flight risk." *Id.*

Given the gravity of the charge, however, the Court finds it necessary to impose stringent conditions of release on Wilkerson, including in-home detention with GPS monitoring at Mr. Williams's home in Crestview.[12]  Wilkerson will not drink alcohol at all and will be subject to random drug testing.  Also, the Court will not tolerate any non-compliance with the conditions and directs the U.S. Probation Office to immediately notify the Court of *any* violations.

Accordingly, it is ORDERED:

1.      Defendant shall be released from custody and shall be subject to the conditions of release set forth in the contemporaneously filed "Order Setting Conditions of Release."

2.      The effect of this Order is STAYED for 24 hours after its issuance for the Government to file an appeal to the District Judge.

DONE AND ORDERED this 6th day of March, 2023.

/s/ Hope Thai Cannon
_____

**HOPE THAI CANNON**
**UNITED STATES MAGISTRATE JUDGE**

---

[12] Mr. Williams indicated there is a firearm at his home.  The U.S. Probation Office must confirm the firearm is removed before Wilkerson is released to the home.